IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**ALBERT L. LOPEZ,**

   Plaintiff,

  vs.                     Civ. No. 11-426  ACT

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   Defendant.


**MEMORANDUM OPINION AND ORDER**

  **THIS MATTER** comes before the Court on the Motion to Reverse or Remand for a Rehearing, With Supporting Memorandum of the Plaintiff Albert L. Lopez ("Plaintiff"), filed September 29, 2011 [Doc. 16]. The Commissioner of Social Security ("Defendant") filed a Response on November 30, 2011 [Doc. 17], and Plaintiff filed a Reply on December 15, 2011 [Doc. 18]. Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court finds that the motion to remand is well-taken and will be granted.

**I.  PROCEDURAL RECORD**

  On November 17, 2008, Plaintiff protectively filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401. Plaintiff is insured for benefits through December 31, 2004, and must show that he became disabled on or before that date. Plaintiff alleged a disability beginning December 1, 2003, due to bilateral feet problems, back problems, post traumatic stress syndrome, finger amputations on the left hand, hiatal hernia and diverticulosis. [Motion at 1; Tr. 63, 69, 134.]  His application was initially

denied on December 29, 2008, and denied again at the reconsideration level on March 23, 2009. [Tr. 14.]

The ALJ conducted a hearing on January 25, 2010. [Tr. 25-60.]  At the hearing, Plaintiff was represented by counsel.  On February 12, 2010, the ALJ issued an unfavorable decision.  In his report, the ALJ found that the claimant has the following severe impairments: low back pain with disc protrusion and small tear at L4-5 without stenosis or herniation; partial amputation of the left index and long fingers and ingrown nails; dysthymia; and post traumatic stress disorder. [Tr. 16.]  The ALJ concluded, however, that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 303, Subpart P, appendix 1. [Tr. 16-17.] The ALJ determined that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except that the claimant is limited to a work setting where claimant can alternate his sitting and standing every thirty minutes, will have limited use of his left hand index and third finger for fingering, must avoid an occupation that exposes him to sudden loud noises, and should have no interaction with the public. [Tr. 17]  In considering the claimant's age, education, work experience, and residual functional capacity, the ALJ established that claimant can return to his previous occupation as a medical laboratory technician, and that there are other jobs that exist in significant numbers in the national economy that the claimant can perform. [Tr. 19.] The ALJ specifically mentioned occupations such as office helper and photocopy machine operator. *Id.*

On April 13, 2011, the Appeals Council issued its decision denying Plaintiff's request for review and upholding the final decision of the ALJ. [Tr. 1.] On September 29, 2011, the Plaintiff filed his Complaint for judicial review of the ALJ's decision.

Plaintiff was born on May 26, 1967, and has completed two years of college. [Tr. 160.] Plaintiff served in the 82nd Airborne Division and the 101st Airborne Division of the United States Army from January 1986 through December 1988, and again from June 1989 through October 1991. [Tr. 110, 161.]   Between 1994 and 1998, claimant worked as an auto mechanic and service manager for an auto mechanic shop. [Tr. 135.]  Between January 2001 and February 2003, claimant worked as a phlebotomist for a primary care laboratory. *Id.*  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 1, 2003, through his date last insured of December 31, 2004.  [Tr. 16.]

## II.  STANDARD OF REVIEW

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).   Social Security

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, *quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its opinion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214 (quotation omitted).

### III.  MEDICAL HISTORY

Plaintiff was 41 years old at the time he applied for DIB. He received all of his medical care during the relevant period from the Veterans Administration Medical Center. The

---

[1] Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(C). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

following represents his medical history prior to the date he was last insured (December 31, 2004).

### A.     **Bilateral Feet Problems and Back Pain**

On March 27, 2003, Plaintiff was seen in the VA GMEDA Clinic by physician Dr. Jerry Montoya. [Tr. 296.]  Dr. Montoya noted that Plaintiff was a new assignment for him.  *Id.*  Plaintiff reported a history of chronic back pain since 1996.  *Id.*  The pain was described as continuous, sharp, radiating down posterior left thigh.  *Id.*  The pain improved with Motrin, and with walking and/or sitting for short periods of time, then restarts.  *Id.*  Dr. Montoya refilled Plaintiff's Motrin prescription (800 mg., three times a day) and scheduled Plaintiff for an MRI of the lumbar spine.  *Id.*

On April 21, 2003, Plaintiff presented to VA Radiology for an MRI, Lumbar Spine W/O Contrast. [Tr. 170.]  VA staff radiologist Frederick W. Rupp, M.D., assessed Plaintiff with "[m]ild left L4-L5 inferior neural foraminal narrowing due to a foraminal disc protrusion with a small annular tear and clinical correlation is suggested.  No lumbar spinal stenosis or disc herniation."  *Id.*

On August 18, 2003, Plaintiff had a follow up appointment with Dr. Montoya and reported increased pain to his lower back, along with increased numbness to his left lower leg and toes. [Tr. 291.] Dr. Montoya referred Plaintiff to the VA Spine Clinic and advised Plaintiff to continue on his medications and return in six months.  *Id.*

On November 13, 2003, Plaintiff was seen by VA orthopedic surgeon Dr. David Huberty regarding his low back pain and numbness on left thigh and down to left foot. [Tr. 270.] Plaintiff described having trouble with prolonged standing or sitting.  *Id*.  Dr. Hubert assessed Plaintiff as having "mild L4-5 degenerative disc disease *with* mild left foraminal stenosis at this

level.  No neuro deficit, but chronic pain." [Tr. 271] Plaintiff apparently had good relief with spinal injections, and Dr. Huberty recommended that Plaintiff see the "minimally invasive team" for nerve root block.  *Id.*

On November 20, 2003, Plaintiff had a scheduled appointment with the "invasive spine" team.  [Tr. 274.] (No progress note for that appointment is in the records.)

On January 2, 2004, Plaintiff was evaluated in the VA Pain Clinic by Dr. Marc Slonimski.  [Tr. 266.]    Plaintiff's chief complaint was back pain and he presented with a history of falling in 1991 as a paratrooper. [Tr. 267.] Plaintiff stated his back pain has remained in the same location ever since the fall – "left low back, post thigh, post lateral leg to lateral foot, last three toes."  *Id.*  Plaintiff described the pain as a constant irritation with occasional burning, and that he sometimes "feels wobbly." *Id.*  Plaintiff asserted his pain was helped by massage and an "unknown injection." *Id.* Plaintiff rated the severity of the pain as a 7/10.  *Id.*  Any prolonged positions triggered worsening pain. [Tr. 268.]  The pain was affecting Plaintiff's physical activities and work.  *Id.*  Plaintiff reported taking Ibuprofen 800mg. tab, three times daily.  *Id.*  Dr. Slonimski assessed Plaintiff as having low back pain likely caused by left low lumbar facet and sacroiliac joint arthropathy. [Tr. 269.]  "The radiation in a semi-S1 distribution should not be caused by 14 NR compression in the 14/5 foramen.  There may be however an additional discogenic pain component or chemical radiculitis from the L4-5 disc irritating the S1 nr.  More likely, however, the LE referral is an unusual pattern of facet/SIJ arthropathy." [Tr.  270.]  Dr. Slonimski noted he "will schedule left lumbar facets and SIJ injections."[2]  *Id.*  Plaintiff was advised to continue his medications without change.  *Id.*

---

[2]   There is no record of Plaintiff having received injections, although Plaintiff testifies that he in fact did receive them. [Tr. 36.]

### D. **Finger Amputations**

On May 2, 2002, Plaintiff presented to the emergency room of the VA Hospital with an injury to his left index and middle fingers. [Tr. 170.] Plaintiff had caught his left hand in the fan belt of his car while working on engine. [Tr. 307.] "There is a loss of the soft tissue tuft of the index finger exposing the distal phalanx. A similar, less extensive injury is noted at the soft tissue over the distal phalanx of the long finger. No other abnormality is observed." [Tr. 171.]

On May 3, 2002, Plaintiff was noted as post-status partial amputations of left index finger and middle finger. [Tr. 307.] Plaintiff had follow-up visits in the VA Orthopedic Clinic on May 13, 2002, May 20, 2002, June 3, 2002, and June 21, 2002. [Tr. 306, 307, 304.] On June 21, 2002, Plaintiff reported that his finger tips are "healed and pain is now minimal, however, pretty sensitive."

On November 5, 2002, Plaintiff was seen by CNP Linda Van Horn. [Tr. 301.] Plaintiff presented wanting to show CNP Horn his fingers because the nails were growing and both fingers were tender with decreased sensation. *Id.* CNP Horn arranged for an orthopedic consult to evaluate excision of Plaintiff's nail beds. *Id.*

On December 30, 2002, Plaintiff was evaluated by VA orthopedic resident Dr. Eric Thomas regarding his left index finger and middle finger nail bed deformity accompanied by pain. [Tr. 299.] Dr. Thomas recommended and scheduled Plaintiff for a nail bed ablation. *Id.*

On September 8, 2003, Plaintiff had a pre-operative exam with Dr. David Huberty in anticipation of having surgery for ingrown nails on his left index and long finger. [Tr. 289]

On September 26, 2003, Plaintiff had surgery on his left index finger and long finger due to ingrown nails following his distal phalanx amputations. [Tr. 310]

On October 9, 2003, Plaintiff had a follow up appointment with VA orthopedic attending Dr. Mital Mohinder. [Tr. 271.] Dr. Mohinder recommended that Plaintiff proceed with normal use of his hand, "except for any impact or grip strength functions." *Id.*

On November 13, 2003, Plaintiff was seen by VA orthopedic surgeon Dr. David Huberty. Dr. Huberty notes that Plaintiff "has done very well following [left index and long finger nail removal and matrix ablation] and has no complaints. Plaintiff has no more pain. Sensation is returning slowly." [Tr. 270.]

### C. Dysthymia and Post-Traumatic Stress Syndrome

On February 26, 2002, Plaintiff met with VA psychiatrist Dr. Leo E. Kreuz. [Tr. 308.] Dr. Kreuz described Plaintiff as a "vet with depression," and noted Plaintiff's goals and progress as "control chronic symptoms" and "fair result." *Id.* Plaintiff was diagnosed by Dr. Kruez as having dysthymia[3] with a history of alcohol abuse and domestic violence. *Id.* No medications were prescribed at that time. *Id.* Plaintiff was advised to return in six months. *Id.*

On August 20, 2002, Plaintiff followed up with Dr. Kreuz. [Tr. 302.] Plaintiff is described as "vet 50% sc ortho with dysthymia." *Id.* Dr. Kreuz's treatment goals for Plaintiff were to "stabilize family life" and "maintain sobriety." *Id.* Plaintiff was scheduled to return to the clinic is six months. *Id.*

On February 18, 2003, Plaintiff had a psychotherapy appointment with Dr. Kreuz. [Tr. 298.] Dr. Kreuz stated his treatment goals and progress as "control chronic symptoms" and "fair result." *Id.* Dr. Kreuz diagnosed Plaintiff with dysthymia and having a history of alcohol

---

[3]Dysthymic Disorder is a chronic type of depression in which a person's moods are regularly low. However, symptoms are not as severe as with major depression.

abuse.  *Id.*  Plaintiff was advised to continue on "psycho Rx" and to follow up in six months.  *Id.*  (Medications not noted.)

On March 10, 2003, the records indicate that Plaintiff presented for a routine psychotherapy appointment. [Tr. 297.]  (No progress note is attached.)

On August 18, 2003, Plaintiff saw Dr. Kreuz for a follow-up psychotherapy appointment. [Tr. 290.]  Dr. Kruez described Plaintiff as "Gulf Era vet 50% ortho now discovers he has lumbar disk disease. . . .   In my professional opinion he has strong case for SC for lumbar disk disorder.  Pain has been causing emotional liability and marital stress."  *Id.*  Plaintiff was told to continue "psycho Rx" and to return in three months.  *Id.*

On November 30, 2003, Dr. Kreuz noted that Plaintiff is "doing fairly well," and should continue on medications. [Tr. 270.] (Medications not noted.)

On February 19, 2004, Plaintiff saw Dr. Kreuz for his quarterly evaluation.  Notes indicated that Plaintiff is a "vet 100% sc ortho with chronic pain[;] dysthymia[;] recently received overall 100%; makes big difference for his family."  Plaintiff was advised to continue his "psycho Rx" and to follow up in three months.  [Tr. 266.]

On August 9, 2004, Plaintiff was seen by Dr. Kreuz. [Tr. 260.]  Dr. Kreuz noted that Plaintiff's last GAF Score was "65" (as of March 21, 2000), and that the treatment goals are "controlling Plaintiff's chronic symptoms."  *Id.*  Dr. Kruez diagnosed Plaintiff with dysthymia and orthopedic disability, and stated that Plaintiff's treatment progress is "fair."  *Id.*   Plaintiff was advised to follow up in three months.  *Id.*

In addition to the VA medical regarding Plaintiff's dysthmia, on December 23, 2008, Social Security physician Elizabeth Chiang, M.D., prepared a Psychiatric Review of Plaintiff. [Tr. 327.]  Dr. Chiang concluded that "[w]hile there is evidence of a psychiatric condition,

evidence is insufficient to assess the claimant's function at the time. IE assessment appropriate for DIB time period." [Tr. 336.]

### D.    Hiatal Hernia and Diverticulitis

On March 2, 2004, Plaintiff was seen by Dr. Jerry Montoya in the VA GEMDA Clinic for a routine appointment. [Tr. 264.] Plaintiff's active problems are noted as chronic low back pain and amputation of two digits of one hand, including the index and middle fingers. *Id.* Plaintiff presented in the clinic complaining of three-week abdominal pain, left upper quadrant, aching sensation, lasting 4-6 hours, 1-2 episodes per day. *Id.* Dr. Montoya started Plaintiff on Raniditine[4] (150 mg., twice daily) and replaced Motrin with Tylenol (1000 mg., three times a day). *Id.* Dr. Montoya also scheduled an Upper GI. *Id.*

On May 6, 2004, Plaintiff presented to VA Radiology for an Upper GI. [Tr. 168.] Radiology found that Plaintiff had a "small gastric hiatus hernia." *Id.*

### A.    General Progress Notes.

On November 1, 2004, Plaintiff was seen in the VA GMEDA Clinic for a routine evaluation. [Tr. 256.] Plaintiff was noted as having chronic low back pain; amputation of two digits of one hand, including the index and middle fingers; abdominal pain of the left lower quadrant; hiatal hernia, and dysthmia. *Id.* His medical problems were noted as "stable." *Id.* Plaintiff was advised to continue medications and to return for a routine checkup in six months.

---

[4]    Raniditine is used to treat ulcers of the stomach and intestines and prevent them from returning after treatment. This medication is also used to treat and prevent certain stomach and throat (esophagus) problems caused by too much stomach acid (e.g., Zollinger-Ellison syndrome, erosive esophagitis) or a backward flow of stomach acid into the esophagus (gastroesophageal reflux disease-GERD).

*Id.* Active medications were identified as Etodolac[5] (300 mg., one capsule twice daily) and Omeprazole[6] (20 mg., one capsule every morning). *Id.*

## IV. DISCUSSION

### A.     Step Four Findings

Plaintiff asserts that the ALJ committed reversible error at step four by failing (1) to consider or include certain impairments in determining Plaintiff's Residual Functional Capacity (RFC); and (2) to accurately evaluate the physical and mental demands required in deciding that Plaintiff could return to his past relevant work. [Motion at 14.] Defendant contends that the ALJ properly determined that Plaintiff has the RFC to perform a limited range of light work and that Plaintiff could return to his former work as a lab technician because employment as a medical laboratory technician only requires light exertional work. [Response at 6.]

An ALJ proceeds to step four in the five-step analysis only after first finding a severe impairment at step two, and then finding at step three that the impairment(s), if listed, does not conclusively find the claimant disabled. See 20 C.F.R. §§ 404.1520(e), 416.920(e); *see also Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988). Here at step two, the ALJ determined that through the date last insured, the claimant had severe impairments of "low back pain with disc protrusion and small tear at L4-5 without stenosis or herniation; partial amputation of the left index and long fingers and ingrown nails; dysthymia, and post traumatic stress disorder." At

---

[5] Etodolac is used to relieve pain from various conditions. It also reduces pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID). It works by blocking your body's production of certain natural substances that cause inflammation.

[6] Omeprazole is used to treat certain stomach and esophagus problems (such as acid reflux, ulcers). It works by decreasing the amount of acid your stomach makes. It relieves symptoms such as heartburn, difficulty swallowing, and persistent cough. This medication helps heal acid damage to the stomach and esophagus, helps prevent ulcers, and may help prevent cancer of the esophagus. Omeprazole belongs to a class of drugs known as proton pump inhibitors (PPIs).

step three, the ALJ found that Plaintiff's severe impairments were either not listed or were not medically equal to the criteria of impairment listings necessary to conclude Plaintiff to be disabled. [Tr. 16-17.] The ALJ then proceeded to the step-four analysis.

> The step four analysis is comprised of three phases.
>
> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), . . . , and in the second phase, [s]he must determine the physical and mental demands of the claimant's past relevant work. . . . In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

*Winfrey v. Chater*, 92 F.3d 1017, 1012 (10th Cir. 1996) (citations omitted). At step four, the ALJ determined that claimant had the residual functional capacity to perform light work, albeit with certain limitations as described earlier, and that he was capable of performing past relevant work as a medical laboratory technician. [Tr. 17, 19.]

The ALJ made several legal errors with respect to the step four analysis.

### 1. **Phase One: Plaintiff's Residual Capacity**

In determining a claimant's physical abilities, the ALJ should "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The ALJ is required to consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. §§ 404.1545(d) , 416.945; *see also Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010).

In making her RFC determination here, the ALJ considered each of the Plaintiff's severe impairments – low back pain, partial amputation of the left index and long fingers and ingrown

nails, dysthymia, and post traumatic stress disorder. [Tr. 18-19.] The ALJ failed to consider any of Plaintiff's impairments that were not severe.

### (a)     **Low Back Pain**

With respect to Plaintiff's low back pain, the ALJ decided that Plaintiff's records during the relevant period confirmed that the claimant had chronic back pain, but that "claimant had [only] mild degenerative disc disease and no neural deficit." [Tr. 18.] The ALJ further noted that the basis for Plaintiff's having established one hundred percent Service Connected disability due to his back condition was "unclear," and in any event "has no effect on the Social Security Commissioner, to whom disability determinations are exclusively reserved." *Id.*  The ALJ concluded that "there is no evidence of a disabling back condition prior to the claimant's date last insured.  Therefore, I find the claimant was not credible respecting his allegation of a disabling back pain condition." *Id.*

The ALJ's conclusion that there is "no evidence of a disabling back condition prior to the claimant's date last insured" is not supported by substantial evidence and is therefore legal error. Here, Plaintiff's VA records provide direct evidence that prior to the claimant's date last insured, December 31, 2004, Plaintiff (1) suffered with chronic back pain, (2) his back pain was increasing in severity, and (3) his back pain was interfering with his ability to work.  [Tr. 296, 170, 291, 270, 266, 267, 268, 269, 270.]  In addition, while the ALJ is correct that other agency findings are not *binding* on the Secretary, "they are [nonetheless] entitled to weight and *must* be considered." *Baca v. Dep't of Health and Human Servs.*, 5 F.3d 476, 480 (10th Cir. 1993) (quotations omitted) (emphasis added); *see also* 20 C.F.R. § 404.1512(b)(5) (stating agency will consider "[d]ecisions by any governmental or nongovernmental agency" concerning disability). Here, Plaintiff's VA records indicate he was evaluated as 50% disabled due to chronic pain

sometime prior to August 2002 [Tr. 302], and that as of February 19, 2004, a date firmly within the relevant period of time to be considered, Plaintiff's condition had deteriorated to the point he was evaluated as 100% disabled with chronic pain. [Tr. 266.]  To the extent the ALJ found the "basis for [the VA's] conclusion is unclear" [Tr. 18], "the ALJ has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca v. Dep't of Health and Human Services*, 5 F.3d 476, 479-80 (10th Cir. 1993) (internal citations omitted).

With respect to Plaintiff's credibility regarding his chronic back pain, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence . . . ." *Winfrey v. Chater*, 92 F.3d 1017, 1020 (10th Cir. 1996) (*quoting Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).  "Credibility determinations are peculiarly the province of the finder of fact, [however,] and we will not upset such determinations when supported by substantial evidence." *Id. (quoting Diaz v. Secretary of Health & Human Servs*., 898 F.2d 774, 777 (10th Cir. 1990)). "A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." *Winfrey v. Chater*, 92 F.3d 1017, 1020 (10th Cir. 1996) (internal citations omitted).  Here, the Plaintiff met this initial burden.  The ALJ is then required to consider all the relevant objective and subjective evidence and "decide whether he believe[d] the claimant's assertions of severe pain." *Id.* (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987).  The ALJ must cite to specific evidence relevant to the factors used in evaluating a claimant's subjective complaints, and explain why if she concludes those complaints are not credible. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995)*.*  Here, the only evidence the ALJ pointed to in support of her finding that Plaintiff's subjective complaints

of disabling back pain were incredible is that the "MRI findings only confirmed that the claimant had mild degenerative disc disease and no neural deficit." [Tr. 19.]  The ALJ's evaluation of Plaintiff's credibility in this regard is flawed because it fails to consider all of the objective evidence and because the ALJ improperly concludes that an MRI finding of "mild degenerative disc disease and no neural deficit" cannot be disabling.

For all of the foregoing reasons, the ALJ's conclusion that there is "no evidence of a disabling back condition prior to the claimant's date last insured" is unsupported by substantial evidence.

### (b)     Partial Amputations

With respect to Plaintiff's partial amputations, the ALJ stated that "during the period under review, the claimant has not pointed to any persuasive evidence of disability for any of the foregoing [partially amputated fingers of his left hand] alleged impairments."  The ALJ supports her finding by stating "claimant is right hand dominant" and the injuries were to his left hand. [Tr. 19]  The ALJ then outlines in presumably chronological order that (1) Plaintiff injured his "left hand and fingers" which resulted in partial amputation of the left index and long fingers, (2) Plaintiff developed sensitivity in the nail beds which were ultimately removed, and (3) Plaintiff reported to the healthcare staff at the VA that was able to use his hand with minimal problems.  *Id.*  This summary by the ALJ reflects an occurrence of events that is in fact out of chronological order and a conclusion that is not supported by substantial evidence.  Plaintiff reported to the healthcare staff at the VA that he was able to use his hand with minimal problems following the partial amputation but *before* he experienced the nail bed deformity accompanied by pain. [Tr. 305.] On October 9, 2003, Plaintiff was seen by VA orthopedic attending Dr. Mital Mohinder following the surgery to repair the ingrown nails, at which time it was recommended

15

that he proceed with normal use of his hand, "except for any impact or grip strength functions." *Id.* One month later, on November 13, 2003, Plaintiff reported he had no more pain and that "sensation was returning slowly." Finally, on December 22, 2008, Dr. Margaret E. Vining, on behalf of the Social Security Administration, prepared a Physical Residual Functional Capacity Assessment and indicated that Plaintiff's "[f]ingering and feeling are limited due to amputation of 2 digits of one hand." [Tr. 319.]

For the foregoing reasons, the ALJ's conclusion that "the claimant has not pointed to any persuasive evidence of disability for any of the foregoing [partially amputated fingers of his left hand] alleged impairments" is not supported by substantial evidence.

### (c)    Dysthymia and Post Traumatic Stress Disorder

With respect to Plaintiff's dysthymia and post traumatic stress disorder, the ALJ concluded that the "[r]ecord reflects claimant is doing well with his depression," and "the record evidence prior to the date last insured, December 31, 2004, is devoid of any documentation of marked or severe or extreme limitation secondary to depression or anxiety." [Tr. 18-19.] The ALJ supports her finding with respect to Plaintiff's depression by pointing to medical records from 2006 and 2009, records outside of the relevant period. This is error.

The records during the relevant period indicate Plaintiff had ongoing and regular psychiatric/psychotherapy treatment in the VA Psychiatry Department since February 2002. [Tr. 308.] Plaintiff was diagnosed with dysthymia, and the psychiatric appointments were generally for the purpose of controlling "chronic symptoms." [Tr.308, 302, 298, 297, 290, 270, 266, 260.] Plaintiff's progress was typically deemed "fair," and Plaintiff was routinely instructed to continue taking "psycho Rx." *Id.* In addition, on December 23, 2008, Dr. Elizabeth Chiang, M.D., prepared a Psychiatric Review of Plaintiff on behalf of the Social Security Administration.

[Tr. 327.] Dr. Chiang concluded that there *was* evidence of a psychiatric condition during the relevant period, but that there was insufficient evidence available to assess the claimant's function at the time. *Id*. Dr. Chiang indicated that an IE assessment was appropriate for the "DIB time period." *Id.* It does not appear from the record that an IE assessment for the relevant time period was ever performed.

The ALJ supports her findings with respect to post traumatic stress disorder by concluding that the record fails to support any of Plaintiff's subjective complaints. [Tr. 19.] While Plaintiff's specific complaints related to post-traumatic stress syndrome are found in Plaintiff's hearing testimony, the fact of Plaintiff's ongoing treatment through the VA Psychiatry Department during the relevant provides indirect evidence that Plaintiff was suffering with mental health issues related to his military service. [See Tr. 308, 302, 290, 266.] To the extent the ALJ required more information regarding Plaintiff's participation in the VA's PTSD group to which he testified, "the ALJ has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca* at 479-80. The ALJ, under the governing regulations, must recontact a treating physician when information the doctor provides is inadequate . . . to determine whether [the claimant is] disabled. 20 C.F.R. § 416.912(e). The inadequacy of the evidence received from the treating physician triggers the duty to recontact. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002). The ALJ erred in not recontacting the VA Psychiatry Department for additional information regarding Plaintiff's treatment and diagnostic evaluations.

For all of the foregoing reasons, the ALJ's conclusion that Plaintiff is doing well with his depression by relying on records outside of the relevant period, and the ALJ's conclusion that the record evidence prior to the date last insured is *devoid* of any documentation of marked or

severe or extreme limitation secondary to depression or anxiety, are not supported by substantial evidence.

### (d) Hernia and Diverticulosis

The ALJ failed to consider any of Plaintiff's impairments that were not severe in determining Plaintiff's RFC. Here, Plaintiff's records support his hiatal hernia and the treatment he sought for it. [Tr. 168, 256, 264.]

### 2. Phase Two: Demands of Plaintiff's Past Relevant Work.

At the second phase of the step four analysis, the ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work. *See Winfrey*, 92 F.3d at 1023 (*quoting Henri v. United States Dept. of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993). To make the necessary findings, the ALJ must obtain adequate "factual information about those work demands which have a bearing on the medically established limitations." *Winfrey*, 92 F.3d at 1024. When the claimant has a mental impairment,

> [C]are must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of task, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

*Id.* Here, the ALJ questioned vocational expert Thomas Greiner about Plaintiff's ability to return his past relevant work as a medical laboratory technician, given an RFC of light work and including the additional limitations as described above. [Tr. 56.] Mr. Greiner stated that "laboratory technician, medical laboratory technician would *probably* fit within your parameters." [Tr. 56.] However, the ALJ made no additional inquiry into, or any findings specifying, the mental and physical demands of plaintiff's past relevant work, either as plaintiff

actually performed the work or as it is customarily performed in the national economy. This is error.

### 3. Phase Three: Plaintiff's Ability to Perform His Past Relevant Work

Having failed to complete phase two appropriately, the ALJ was unable to make the necessary findings at phase three about plaintiff's ability to meet the mental and physical demands of his past relevant work despite his physical and mental impairments.

## B. Step Five Findings

The Court will not address Plaintiff's remaining claims of error at step five. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Decision [Doc. 16] is granted for proceedings consistent with this memorandum opinion.

_____
**ALAN C. TORGERSON**
**United States Magistrate Judge,**
**Presiding**